22-48. Counselor, you reserve financial of your time for rebuttal. Correct, your honor. Okay, you may proceed. Thank you, your honors, and may it please this court, the University of South Florida filed suit in 2015 seeking to recover fees for a license taken by the New York patent directed to the treatment of Alzheimer's disease. To shield the government from that liability, the Court of Federal Claims created an implied-in-fact agreement between USF and Mayo Foundation. Mayo, an entity that provided no evidence whatsoever, and with respect to whose conduct concerning this implied-in-fact agreement, we have no evidence. Can I just ask, how did this litigation proceed without either side getting information from Mayo? Your honor, it was not the burden of USF to present Mayo's evidence. It is the burden of the government to present that. Neither side asked for... We asked, your honor. Without depositions of Mayo subcontracting officials or the like? What I inquired, your honor, was who could speak to that issue, and the events happened so far back in the past you'll notice that even the name of the entity transitioned from Mayo Foundation to Mayo Clinic to Mayo Clinic Rochester. I asked, but nobody was available to answer that question. We submit, your honor, that this implied-in-fact agreement is contrary to the facts of this case. It's contrary to the law governing implied-in-fact agreements, and critically. Does affirmance here require an affirmance of the finding that an implied-in-fact contract existed? Why isn't it enough if, as I think the evidence does make clear, that money went to USF after the November 2017 express contract in part to pay for pre-contract work that led to the 1997 actual reduction to practice? I'm going to hold onto one part of that, that is the money went to pay for that. I'm not sure that there's complete agreement on that, but whether it did or did not, your honor, according to statute, according to the Bayh-Dole Act, the money has to go to USF before the actual reduction to practice. It is tied to the for. I think you're focusing on exactly what to me is a statutory question, but I'm not sure why funding for work under an agreement requires that the agreement precede the work. Well, it's funding for that work. If the work has been done, your honor, and the, for instance, the grantee, in this case Mayo, decided to withdraw that funding, there was no obligation at the time. Who then owns the invention? That's why the statute specifies not intent, not declaration, not the filing of a patent application, although those are all elements of 35 U.S.C. 202. The statute specifies the timing because it's reliable and indicative. It's not what you plan for, your honor. It's what happens, and what happened in this case is there was no money paid. USF had ownership of the patent rights long before the grant was ever signed, and USF proceeded with that work through the actual reduction to practice on April 25. That seems contrary to the finding of the claims court below, which found that money was provided from Mayo to USF for the work done prior to the reduction to practice. The court's finding is explicitly contrary to the facts. Four different witnesses testified identically at trial before any money could go to USF. There had to be a contract, a subcontract, actually signed by the two parties. As your honors have observed, one was signed, but not until well after the actual reduction to practice back in April. I hear what you're saying. I that you're focusing on, and I see the finding as saying that money was provided, funds from NIH were supported, were used towards the work performed, but it might have been retroactive. No, your honor. Money was provided, but who provided that money? USF provided that money. The testimony of David Morgan, who was the principal investigator for section 5 of the grant, specifically testified, not that he remembered doing it, but that's what he would have done, because it was so critical to have continuous funding. We may be talking past each other. I am prepared to assume right now that the evidence does not permit a reasonable finding that money under this contract flowed to USF before the November 2017 time. Let's assume that. I think what we've both been asking about, but certainly just speaking for myself, that doesn't mean that money didn't flow from Mayo to USF, the flowing starting in November 2017 for the April, not 2017, 1997, for the April 1997 actual reduction to practice work. That's two steps, your honor, and I would like to talk about both of them briefly. The first step is, can you pay it back later? Can you pay because you wanted to, but the government or the contractor didn't act quickly enough? The answer to that, your honor, as far as research has shown to us, the answer is no. The statute is very clear. The statute is very specific because it's necessary to be clear to answer or to promote the goals of the Bayh-Dole Act, to promote that transfer, because what would happen, your honors, if the University of South Florida relied on that promise and then Mayo or the university failed to go forward? I hear your policy argument, but what language are you relying on specifically in the statute? The language of the statute is 202. It's got to have, on 201, I'm sorry, it's got to happen before the actual reduction to practice. So this is the section 201, the definitions. The definition of subject invention. Before the conception. I'm sorry, I see. What precise part of section 201 are you relying on? There's a definition, for example, of the funding agreement. What exactly are you relying on? Okay. The definition of funding agreement is definitely part of our argument, your honor. The definition of funding agreement, according to statute, requires in section 202C, which was the point of reliance of the court of federal claims, it requires that the funding agreement include eight different provisions designed to achieve the goals of the Bayh-Dole Act. Eight different provisions. The court of federal claims gave one provision, the license provision, which is the fourth provision. But that's why there can never be an implied... Aren't we talking about the subcontract here? No, your honor. We're talking about any contract. Isn't the agreement between Mayo and USF, the subcontract, as defined in the funding agreement term, which includes a funding agreement between the US government and Mayo, which includes a USF? Your honor, I have to disagree. The funding agreement, the overrun, is between the government and Mayo. USF doesn't get any rights of any kind under that funding agreement. It's only when the subcontract is entered into. I understand. I'm just trying to make sure I'm following your statutory argument. You were saying the funding agreement has to have all these eight sections in it, but I don't see how that relates to the issue that you're talking about now, because we're talking about the subcontract between Mayo and USF. Because no implied in fact agreement could possibly... I am sorry, your honor. No implied in fact agreement could possibly satisfy the standard of those very specific and clearly stated requirements of 202C. And in your view, the subcontract has to have those requirements? Your honor, the statute is indifferent to whether it's a subcontract or a contract, a government grant. It's indifferent to that. You cannot say, oh, I'll fill it in later. The contract, the government, there are two funding agreements. One is an agreement, a grant between USF and Mayo. There is a second agreement, a grant with Mayo and USF that does not have any of those provisions other than the license. I understand what you're saying. So you look at so your argument is based on the definition of the funding agreement, as well as section 202, which has specific things that have to be in the agreement. Is there anything else that I should look to for your view that it can't be that there would be a subcontract that refers to payments made for earlier work? Only that this subcontract does not refer to under the law, and we do not agree that that's permitted. But if that was permitted, if there could be a look back, David Morgan called them advances. If you could have that, you'd have to reference it. Marsha Gordon testified at trial that there was no earlier provision of any kind. So you can't conjure up the future by altering the past, your honor. Did you argue to the Court of Federal Claims that one reason there could not have been an legally sufficient implied in fact agreement was the absence of provisions that comport with the 202c list? We did, your honor. We did. Do we have something in the appendix? And I do not have, we don't have that appendix. I thought that the government's forfeiture section of its brief said you did not. Because we presented it at summary judgment, your honor. And the court denied that summary judgment. Once you've preserved it in some government's brief, suggest that summary judgment does not preserve the issue. We disagree. Before you sit down, I have a question. You mentioned there was two agreements at play here, one between USF and Mayo and the other between Mayo and the government. Is that correct? That is correct, your honor. And do both of those agreements touch on the same subject matter? Yes, your honor. They are both directed to the same subject matter, different points in time. Right. But it's the same subject matter. For all intents and purposes, yes, your honor, except for whatever happened in that intervening year and three months. Some action may have occurred with respect to Mayo and the US with respect to project five that did not involve the mice of the 094 path. I'm not focused so much on the conduct and when it occurred. General text, general subject matter is the same in both. Yes. Okay. Okay. We will restore your time. Thank you, your honor. Mr. Brown, let me let me ask you a question so that you can start off. Is it possible to have an implied, in fact, agreement and an express agreement that deal with the same subject matter? Not at the same time, your honor. Had there, you know, the issue here is what was going on in the fiscal year 1996, October 1st, 96 through September 97. That's the relevant time period. There was no express agreement, written agreement that's ever been brought for. Had there been one, one would presume under normal contract law, that agreement would supersede in an implied agreement agreement. Where we disagree with USF is they're saying the written agreements for the later two, the year two and year three of the grant, which is not in the relevant time somehow governed the first time period and that there was no agreement whatsoever. So, yeah, to answer your question, yes, the express agreement would govern that time period if there were one. What the trial court said going to this point, I should say, is trial court noted in terms of what you would imply in the agreement, one of the reasons you would imply these 202 requirements when this issue came up in summary judgment is you would likely imply the same terms that you see in the express agreement in year two and three to the grant. The consortium agreement that's discussed in our brief and what the court said at that stage when it was raised was you would likely have these terms because the parties recognized them a year later that they existed. So hopefully I answered your question. So do we need to find, to approve the finding of an implied intact agreement in order for us to approve it? I don't think so, Your Honor, and this goes to a latter part of our brief. We do think that contractually you could find an implied contract and that the court's actions were proper. So you may not have to reach what I'm about to say, but we don't think an implied contract was necessary. When you look at the Baby case, the court there when you look at the nature of the Bayh-Dole Act and the sort of automatic license provision that was intended, you have both the statutory license that's automatically provided by statute and then by telling parties to put this in the contract, you have a contractual requirement. So to answer your question briefly, no. I don't think I understood your explanation. Sure. So I was trying to suggest in my questions with Mr. Kelber that the statute seems to permit saying that work paid for by a contract formed at time two can be under that agreement even if it preceded time two as long as the payment, as long as that contract provided for payment for that pre-contractual work. So you're suggesting that the year two contract, if money came in technically under that contract but paid for... I'm actually quite confused about the whole year two business. Okay. I'm not interested in the NIH contract. Okay. Okay. I'm interested only in the Mayo-USF relationship. I'm interested if you want to say forget about that relationship but not now. I think I understand your question. If money ultimately flowed for the time period, the actual reduction to practice from Mayo to USF... But that started flowing after, when it was in November 1st, effective date of the... That makes no difference in our view, your honor, this sort of retroactive payment. And again, I think to your point, the statute's very clear. The goal of the statute is did this money fund this work? What is conception? What is the actual reduction in practice? And would you consider that to be work done under the agreement on the assumption that the agreement was not in existence at the time of the work? I think one could view it that way. I mean there's different ways. Obviously the court took a different structure to it, but I think you could view it that way, yes. And again, I think another point on this retroactive payment... Are you saying that work that was performed prior to the express agreement is no less still covered by the express agreement? Well, it's obviously not what the trial court said. I think depending on what, he was talking in the abstract about a later written agreement. No, I was not talking in the abstract. I was talking about this case. I think in this case... I think that the testimony is quite clear that money eventually flowed, by eventually I mean after the November 1997 contract was adopted, to pay in part for the earlier April 1997 work. Because USF was fronting the money and USF was getting the money back. So you look at the record, Dr. Morgan testified that he was absolutely certain that money flowed. I want to put that aside because I'm assuming what I in fact believe is that that the record does not support that. That money ever flowed pre-November 1997 contract. So just assume that for a minute. But I think the record is quite clear that money flowed starting in November 1997 for work done earlier. Right. And hence my question, why isn't that enough? Well, I think it would be enough if you are, again, if whatever structure you adopt, either implying a contract or looking at as it being subject to the later written agreement, the point of the statute is that does money pay for the first actual reduction of practice? And under your view of the facts, even if it's different from mine, that's still the same. It's still paid for that. And the reason I think that should suffice under an implied fact contract we think is the best theory or another theory, the reason that should suffice is otherwise with regard to a USF-Mayo agreement where the government's not a party, their motivation is either inadvertently or purposely to just basically put off the flow of actual money until after the date of the first actual reduction to practice. And that's not the intent of the statute. I think that would provide insufficient protection of government rights and the subcontract that they're not a party to. So is it right to say that the argument for the analysis of why the government had these rights that I've just been sketching is not an analysis you pressed in this case? I think we pressed it with different terminology in discussing the Mady case to basically say there's a statutory license. So even if you're struggling to put an agreement in place that has a government license provision, whether it's implied or expressed, Mady said that it's sort of nonetheless you would statutorily, more of an implied law theory I guess, you would have a statutory license in addition to one that's provided by contract. So I think that would be my answer to the question in terms of where we touched upon these concepts in our brief. And Mady isn't just a court decision, but they made a clear distinction between what would be in a contract in instances where it may be an express agreement that's totally missing. Obviously here the second year contract, when there was an express contract, Article I believe 17 of the agreement. I'm sorry, what are you referring to by the second year contract now? The November 97 agreement you've been referencing. Obviously we haven't mentioned this, but it obviously has those provisions. So you're calling that a second year contract because why? It's the first contract, first actual contract that existed between Mayo and US. First express written contract, that's right. And this is because it's the second year of the NIH grant, is that why you're calling it that? Correct, correct. And it was enacted during that second year of the NIH grant. I also want to touch on a couple things that were raised in your questions to Mr. Kilbur. First of all, regarding his arguments that all the requirements of 202C, all eight requirements were not brought up at trial. Again, I think his answer is correct. These were arguments that were addressed at summary judgment. Court highlighted the fact at trial there were factual issues to be determined regarding 202C4 in particular, but these arguments regarding the specific elements of implied contract and the specific 202 requirements were never addressed in their pre-trial contentions, the week-long trial, or in their post-trial arguments. So the court didn't address it in detail in its trial decision, and I think that's not surprising. With regard to the factual findings, again, and we've touched on this already, USF has ignored the trial court's extensive factual findings that NIH grant funds flowed from the Mayo Clinic to USF beginning in October 1996. That's what the court found. When you look at the court's opinion, in the first portion of the opinion, she talks about... I'm sorry, give me a page of a particular document, please. Sure. This would be appendix page 10. And in particular, I mean, there's a mountain of evidence, there's a lot of documents, but in particular, she talked about, in her opinion on the last paragraph on appendix page 10, that Dr. Morgan's testimony agreed with Dr. Gordon that her employment contract was for that time period. She goes on further to say that Dr. Morgan concluded that because they were working on that project, and that was the first year of the grant, starting in September 1996, because there was an account number that stated it was paying her for that salary, it made sense that Dr. Gordon was paid under the Mayo subcontract. It goes on to say that his recollection... I mean, if you can bear in mind what at least I think is pretty important to keep separate, I don't think there's the slightest doubt that there were USF accounts to which certain expenses, including salaries, were charged, and they had a name of those accounts that indicated USF fully expected the money to come to reimburse them, or ret, I think is the term, retroactive something. But almost no evidence that money actually flowed from Mayo to USF during this period. The best I think you have is that at one point, Dr. Morgan said, yeah, that happened, and then when pressed, he said, you know, this is like 20 years ago, I don't actually remember, the way it ordinarily would have happened is that USF advanced the funds, we eventually got them back, and everybody understood that, which struck me as, I guess, leaving without adequate support any finding, and I'm not sure there really is a finding, that money flowed pre-November 1997 to USF from Mayo. He said a few things in this, I do agree with you, our reliance would be primarily on Dr. Morgan's testimony. And then Dr. Gordon's employment contracts, which seems to me, don't really distinguish between where the money eventually is going to come from to pay for her salary, and when the money comes. That's why it didn't seem to me enough, and I remember, those are the two things in the relevant section of your brief, about the factual section later, that you point to, to support this proposition. They don't strike me as enough. To your question, I would point to Dr. Morgan's testimony. He was the person in charge of this money. He's the most knowledgeable fact witness in the absence of documents. Again, government never had these documents. By the way, we did go to Mayo. I got the same answers, apparently, Mr. Kilberg got, when I proposed a subpoena, and they said they had absolutely no records of this grant, which has raised the issue of the subcontract. Very implied. How the government preserves rights. But to your point about when the money flowed, Dr. Morgan testified that he was, best of his recollection is, it started by December 1996. He also stated... And then he modified that. He said that was speculation. He said he didn't remember. He remembered the way this sort of thing always happens. Right, and at one point I asked him how certain are you that money was flowing by April 25th, 1997, the date of the Coppola facsimiles. He said he was 95% certain it would have been flowing by that date. Mr. Brown, one of the problems I'm having with this, your view here, is that I don't read the court's opinion as finding what you've said the court has found. I see the court's finding on page 813. It's the last paragraph above the heading C, and it says the court finds the testimony of Dr. Morgan and Dr. Gordon credible, and it says the court concludes the evidence establishes that plaintiff's work on the MICE and the 094 patent was performed using funds from NIH grant, blah, blah, blah, as early as October 1996. That doesn't mean the money was flowing in October 1996. It means she found that that money did, you know, that money was paid for that work, but that's different. I don't think, I don't see where she made a finding that you're saying here today that about that the money flowed prior to the reduction of practice. I don't know that she needed to for the reasons we've discussed, but I don't see it, I don't see it on, I think on page 810 that you cited earlier, she's only talking about what the testimony is. And to be clear, I would agree with you, her opinion doesn't depend on that distinction, and I think she ruled that it wouldn't be a distinction with meaning, but she did find Dr. Morgan, as you say, credible, and Dr. Gordon was credible, and specifically, again, Dr. Morgan testified his best recollection, the best evidence we have at this point, and she notes that his recollection was that they had funds by 1996. So there is a factual finding to that point at 810. And specifically, I'm looking at the bottom portion of the last paragraph there. His recollection without documentation was that plaintiffs had funds by December 1996 that we were using in order to pay for the mouse costs and the reagents we used and people's That's true, but it doesn't say whose funds they made. No, he goes on to say they were very financially dependent on the grant in this passage. Right, but there was, as I understand it, there were some, you know, there were some accounts that were made, and they were initially funded by USF, right, for, to be paid eventually by the government, by the NIH funds. It was a placeholder. For a period of time, but he's saying that typically the placeholder would only be the six months, and even if you go to the typical six months, that's still a month before the reduction to primed us. And he made it very clear that, you know, they were very financially dependent specifically on this grant money. So in terms of USF floating the money, that was only temporary, and you look at the bulk of his testimony, it was very temporary. Okay, Kels, you're out of time. Thank you, Your Honor. Mr. McClure, I'll restore you to five minutes. Thank you, Your Honor. What inventions are subject to the provisions of the Bayh-Dole Act, 200 through 212? Those subject inventions are the inventions made under the agreement, that's the language of the statute. The statute refers to the terms of the agreement later on. What agreement is being referred to? Can it be any agreement? We submit that it cannot, Your Honors. We submit that the statute is referring to the agreement that brings funding from the United States, in this case to a not-for-profit entity, Mayo, and thereafter, if money goes to a third party, another not-for-profit entity, that agreement is not the agreement referenced initially as the subject invention. You cannot put someone in a time machine and say, I know you wanted to make this invention, and I know you did make the invention, but we're now going to transport you back in time and take away your rights. That would be contrary to the very provisions the Bayh-Dole Act was and would go forth. USF in, say, October of 1997, when it's negotiating the terms of the November agreement that initially got signed, could have said, we do not want a penny for any work we have already done. Well, you couldn't get a penny for any work you've already done, because that's the We don't want ownership of the inventions that have already been made, because that's what Wait a minute. Ownership is between USF and Duff and Hardy, and that was done in October of 1996. Election, Your Honor. That's a provision of the statute, of the eight. Three of them precede Oh, not ownership. They don't elect to maintain the rights, as opposed to what, like dedicating to the public or something. You can't resurrect those. You've got to decide them when the statute says you decide them, because what would happen, Your Honor, if we had the opposite situation, if the parties had planned on funding the mice of the 094 patent, certainly Hardy and Duff had conceived of that, and they intended it to be part of that grant, and like so many inventions, it failed. Is the government in what is year two of the grant, with the first year of the contract between the government now going to pay USF for that failed experiment, knowing that it's a failure? Not if Mayo is going to go forward and negotiate that. Why would that? Why would USF consider that a reasonable approach? It's the inventions to come that are to be funded under the agreement. The inventions to come that are to be funded under agreements where the United of discussion in the court's opinion and at trial about the difference between Project 5 and Project 4. Project 5, which was part of David Morgan and Marsha Gordon's project, they were responsible for that. That wasn't finished by November of 1997. If an invention came from that, and they had hoped there would be, it would belong to the government under license. But the government cannot move the time back simply because of intention. With regard to one other issue, is there better evidence than David Morgan's intent? Of course there is, Your Honor. Marsha Gordon testified that there had been no license before the November 1994. No agreement. I appreciate the time, Your Honor. The focus has been which agreement we submit that the statute does not permit looking forward and saying you can have the invention that the parties did not, did not fund at the time. Thank you, Your Honor. We thank the party for their argument this morning. This court may now stand in recess.